18

*In re* Solicitud de Samuel Cepeda García *et al.*

*Número:* MC-92-001 *Resuelto:* 28 de febrero de 1992

PER CURIAM: Con fecha de 22 de enero de 1992 los señores Samuel Cepeda García, Fernando Tonos Florenzán, Héctor Castro Marchán y José Guillermo Rodríguez, todos Repre-

sentantes del partido de mayoría en la Asamblea Legislativa, sometieron ante el entonces Juez Presidente de este Tribunal, Hon. Víctor M. Pons Núñez, "en su carácter de Jefe de la Rama Judicial del Estado Libre Asociado", un escrito en el cual alegaron que las expresiones de los Jueces Asociados Señores Antonio Negrón García y Francisco Rebollo López, el pasado 10 de enero de 1992, en ocasión del juramento de los Jueces Superiores Bruno Cortés Trigo y Wilfredo Santos López, constituyen violaciones a los Cánones I, XI y XIII(f) e (i) de Ética Judicial, 4 L.P.R.A. Ap. IV-A. Solicitaron que estas actuaciones de los Jueces Asociados Señores Negrón García y Rebollo López fueran evaluadas, analizadas y estudiadas, y que en su día tomásemos las determinaciones que estimásemos procedentes.

El ex Juez Presidente Pons Núñez dio conocimiento inmediato de la solicitud a todos los Jueces del Tribunal. El actual Juez Presidente, José A. Andréu García, sometió el asunto a la consideración del Pleno del Tribunal. Los Jueces Asociados Señores Negrón García y Rebollo López se han inhibido y no han participado en la consideración de este asunto.

## I

De acuerdo con los solicitantes, los hechos que avalan su posición son los siguientes:

1. El pasado 26 de diciembre de 1991, el señor Gobernador, Honorable Rafael Hernández Colón, nominó al licenciado Jaime B. Fuster para el cargo de Juez Asociado del Tribunal Supremo, en sustitución del Honorable Juez Asociado, José A. Andréu García, quien fuera nominado a ocupar el cargo de Juez Presidente del Tribunal Supremo.

2. Al momento de su nombramiento, el licenciado Fuster se desempeñaba como Comisionado Residente de Puerto Rico en Washington, habiendo sido electo para ese puesto en los comicios electorales de noviembre de 1988.

3. Miembros del Partido Nuevo Progresista criticaron los nombramientos del Primer Ejecutivo.

4. El 14 de octubre de 1991, el señor Gobernador nominó para el cargo de Juez Superior al licenciado Bruno Cortés Trigo, quien fue confirmado por el Senado de Puerto Rico el 4 de noviembre de 1991.

5. A la fecha de su nominación, el licenciado Cortés Trigo se desempeñaba como Asesor Legal del Gobernador.

6. El pasado 8 de enero de 1992, el señor Gobernador nominó al licenciado Wilfredo Santos López para el cargo de Juez Superior.

7. A la fecha de su nominación, el licenciado Santos López ocupaba el cargo de Representante a la Cámara de Representantes de Puerto Rico, habiendo sido electo para ese cargo en los comicios electorales de noviembre de 1988 por el Partido Popular Democrático.

8. El 9 de enero de 1992, el Presidente del Partido Nuevo Progresista, el Dr. Pedro Roselló, candidato a Gobernador por dicho partido, exigió de la Senadora Victoria Muñoz Mendoza que no permitiera que la judicatura se convirtiera en un "refugio de políticos forzados al retiro["].

9. El doctor Roselló solicitó de la Senadora Muñoz que estableciera como política "que no se harán o confirmarán nombramientos a la judicatura de políticos electos a servir al pueblo en este cuatrienio." Así como también le solicitó que "no se confirmen nombramientos a la judicatura de ayudantes de confianza de la Rama Ejecutiva["].

10. El 10 de enero de 1992 en la ceremonia de juramentación de los Jueces Superiores, Cortés Trigo y Santos López, los Jueces Asociados Negrón García y Rebollo López criticaron severamente al señor Gobernador por nombrar a la Judicatura a personas que ocupan cargos públicos electivos y de confianza.

11. La prensa del país reportó que el Juez Asociado Rebollo López "calificó el proceder de Hernández Colón de un 'grave abuso de discreción como Gobernador'."

. . . . . . .

13. El Juez Asociado Rebollo López indicó que, a su juicio, la actuación del señor Gobernador de llenar una vacante en la judicatura con una persona que al momento de ser nominado se desempeñaba en un cargo político electivo, era irrazonable y violatoria de la Sección 12 del Artículo V de la Constitución del Estado Libre Asociado.

. . . . . . .

15. Las manifestaciones de los señores Jueces Asociado[s]

fueron difundidas ampliamente por todos los medios noticiosos del país.

16. Las expresiones de los Jueces Asociados Negrón García y Rebollo López han sido objeto de un editorial periodístico, en el cual se les felicita; así como también de críticas públicas. El Honorable Juez Asociado Rebollo López por su parte ha ripostado a las expresiones públicas del señor Gobernador, entablando con éste una polémica pública sobre este asunto.

17. Las expresiones del candidato a la gobernación por el Partido Nuevo Progresista el doctor Roselló, sobre los recientes nombramientos a la judicatura del Gobernador, han ido dirigidas a convertir en un "issue" político —este año eleccionario— los nombramientos judiciales del Gobernador de Puerto Rico.

18. Tan es así, que el Senador Nicolás Nogueras, del Partido Nuevo Progresista, ha instado un pleito impugnando el nombramiento del Juez Santos López.

19. De otra parte, la delegación novoprogresista en el Senado de Puerto Rico, ha presentado sendos proyectos de enmiendas constitucionales, dirigidos a fijar en nueve (9) el número de jueces del Tribunal Supremo, prohibiendo que un partido político pueda nombrar más de seis (6); y a prohibir que legisladores, que el Comisionado Residente, y que alcaldes puedan ocupar cargos en la Judicatura.

20. Es evidente, que la estrategia del Partido Nuevo Progresista va dirigida o encaminada a convertir en un 'issue' político de campaña eleccionaria, los nombramientos judiciales del señor Gobernador. De ahí las críticas a los nombramientos del licenciado Fuster, Cortés y Santos, entre otros. De ahí la exhortación del doctor Roselló a la Senadora Muñoz a que repudiara las actuaciones del Gobernador. De ahí también la razón por la cual un legislador del Partido Nuevo Progresista ha instado un pleito impugnando el nombramiento del licenciado Santos. De ahí la razón para las propuestas enmiendas a la [C]onstitución que se ha indicado serán sometidas a la consideración de la Legislatura.

## II

■ En nuestro sistema republicano de gobierno rige la teoría de la separación de poderes entre las tres (3) ramas de gobierno: la ejecutiva, la legislativa y la judicial. "La relación entre los poderes del Gobierno debe ser dinámica y armoniosa. Su éxito depende de que cada una acepte y

respete la autoridad de las otras y entienda la interrelación de sus funciones." *Silva v. Hernández Agosto,* 118 D.P.R. 45, 57 (1986).

 Por la naturaleza de las funciones de la Rama Judicial, nuestro ordenamiento constitucional establece unos mecanismos para garantizar dicha independencia en su interrelación con las otras dos (2) ramas. La independencia judicial, ingrediente esencial para garantizar un proceso decisional imparcial, es, por ende, un componente ínsito de la separación de poderes. Eje central del esquema constitucional lo son, entre otros: (1) el que los Jueces del Tribunal Supremo desempeñen sus cargos mientras observen buena conducta, Sec. 8 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, y (2) el que sólo puedan "ser destituidos por las causas y mediante el procedimiento que [la] Constitución establece en la sección 21 del Artículo III".(1) Art. V, Sec. 11, Const. E.L.A., *supra,* ed. 1982, pág. 361. Véanse: P. Abrams, *Spare the Rod and Spoil the Judge? Discipline of Federal Judges and the Separation of Powers,* 41 (Núm. 1) De Paul L. Rev. 59 (1991); P.D. Carrington y B. Allen Babcock, *Civil Procedure: Cases and Comments on the Process of Adjudication,* Boston, Ed. Little, Brown and Co., 1983, Cap. 2, Sec. A.

(1) La Sec. 21 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, págs. 346–347, dispone lo siguiente:

"[Procesos de residencia]

"La Cámara de Representantes tendrá el poder exclusivo de iniciar procesos de residencia y con la concurrencia de dos terceras partes del número total de sus miembros formular acusación. El Senado tendrá el poder exclusivo de juzgar y dictar sentencia en todo proceso de residencia; y al reunirse para tal fin los Senadores actuarán a nombre del pueblo y lo harán bajo juramento o afirmación. No se pronunciará fallo condenatorio en un juicio de residencia sin la concurrencia de tres cuartas partes del número total de los miembros que componen el Senado, y la sentencia se limitará a la separación del cargo. La persona residenciada quedará expuesta y sujeta a acusación, juicio, sentencia y castigo conforme a la ley. Serán causas de residencia la traición, el soborno, otros delitos graves, y aquellos delitos menos grave[s] que impliquen depravación. El Juez Presidente del Tribunal Supremo presidirá todo juicio de residencia del Gobernador.

"Las cámaras legislativas podrán ventilar procesos de residencia en sus sesiones ordinarias o extraordinarias."

■ La Constitución fijó taxativamente las causas y los procedimientos para el residenciamiento de los Jueces del Tribunal Supremo.([2]) Limitó las causas a "la traición, el soborno, otros delitos graves, y aquellos delitos menos grave[s] que impliquen depravación". Art. III, Sec. 21, Const. E.L.A., *supra*, pág. 347.

■ Distinto ocurre con los jueces de instancia, con relación a los cuales la Constitución del Estado Libre Asociado especifica que podrán ser destituidos por el Tribunal Supremo por las causas y mediante el procedimiento que por ley disponga la Asamblea Legislativa. Art. III, Sec. 21 y Art. V, Sec. 11, Const. E.L.A., *supra*; Sec. 24 de la Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. sec. 232); *In re Gallardo*, 81 D.P.R. 19, 47, 52 y 54 (1958), opinión del ex Juez Presidente Señor Negrón Fernández.

Con relación a esta disposición constitucional, el ex Juez Presidente Señor Negrón Fernández expresó lo siguiente:

---

([2]) Con relación a la disposición de residenciamiento de los jueces federales de la Constitución de Estados Unidos, que es similar a la nuestra, se ha dicho lo siguiente:

"A limitation of impeachment to indictable crimes was not, in the author's opinion, the intent of the framers and is not a proper interpretation of the constitutional provisions. *On the other hand, the extension of impeachment to non-indictable offenses not connected with the use of official power was not within the intendment of the framers and is not supported by English impeachment precedents.*

"To be impeachable, an act must fall within one of two categories. It must violate some known, established law, be of a grave nature, and involve consequences highly detrimental to the United States. In the alternative, it must involve evil, corrupt, wilful, malicious or gross conduct in the discharge of office to the great detriment of the United States. Acts which result from error of judgment or omission of duty, without the presence of fraud, or from the misconception of duty, without the presence of a willful disregard, are not impeachable. *Acts of a non-indictable nature outside of one's office, such as writing books and articles, associating with persons and organizations engaged in questionable activities, delivering speeches of a political nature, and engaging in conduct which some view as socially and morally objectionable are not properly within the scope of impeachment. Indeed, it would be incongruous to find an official exercising constitutional rights of speech and association guilty of 'high Crimes and Misdemeanors' against the United States.* When a public official engages in private, independent conduct, he is subject to the positive laws as any other citizen, except that if he commits a 'high Crime,' he is subject to the additional punishment of impeachment and removal from office." (Énfasis suplido y escolio omitido.) J.D. Feerick, *Impeaching Federal Judges: A Study of the Constitutional Provisions*, 39 (Núm. 1) Fordham L. Rev. 1, 54–55 (1970).

*La disposición constitucional en el sentido de que "los jueces de los demás tribunales podrán ser destituídos por el Tribunal Supremo por las causas y mediante el procedimiento que se disponga por ley", va dirigida a que se supla, por acción legislativa, un medio sustituto al de residencia (impeachment) provisto en la Constitución para la destitución del Gobernador, del Contralor y de los jueces del Tribunal Supremo, pero con idéntico fin:* la destitución de los jueces de los demás tribunales; y tiene, de un lado, el alcance de señalar a este Tribunal como el único foro con autoridad para expulsar dichos jueces de sus cargos y, de otro, el de establecer el mandato de que la Asamblea Legislativa fije las causas y el procedimiento para esa expulsión. *La citada disposición, sin embargo, no limitó la autoridad de la Asamblea Legislativa —en el uso de los plenos poderes que le pertenecen—para fijar, como fijó en la sección 24 de la ley, otras penalidades disciplinarias por conducta que, siendo impropia en un magistrado, no fuere de tal naturaleza que hiciera imperativa su remoción del cargo.* Y aún cuando en lo relativo a la destitución en sí, el precepto constitucional opera como una limitación a la autoridad de este Tribunal para, por vía de desaforo, expulsar a un juez de su cargo —ya que en virtud de dicho precepto, las causas y el procedimiento para la destitución deben proveerse por, y emanar de disposiciones de ley, estándole vedado al Tribunal ampliarlas a su arbitrio—tampoco limitó, desde luego, la autoridad inherente de este Tribunal para disciplinar a un miembro de su propio foro, por el hecho de ser juez, por conducta impropia observada como magistrado, la cual, de haberla observado un abogado, lo expondría a una suspensión o censura. (Énfasis en el original suprimido, énfasis suplido y escolio omitido.) *In re Gallardo*, supra, págs. 47–48.

■ No obstante la limitación constitucional, este Tribunal, reconociendo que las garantías constitucionales de independencia judicial presuponen *un ejercicio ético, digno, ponderado, discreto y ejemplarizante de ese poder*, optó por autolimitarse imponiéndose, como parámetros para la conducta, que cada uno de sus Jueces tiene la obligación moral de observar las mismas normas éticas que son aplicables a los jueces de instancia.([3]) Canon XXVI de

---

([3]) La aplicación de los parámetros de los Cánones de Ética Judicial a los Jueces del Tribunal Supremo, sin embargo, no implica el que éstos puedan ser *residenciados, destituidos, removidos, suspendidos* o *amonestados*, por causas y mediante pro-

Ética Judicial, 4 L.P.R.A. Ap. IV-A; Art. 1 de la Ley Núm. 25 de 20 de abril de 1945 (4 L.P.R.A. sec. 3); *In re Solicitud de Lugo Bougal y Arraiza*, 112 D.P.R. 134 (1982);[4] R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, pág. 71.

## III

La situación objeto de esta solicitud no es nueva. En el pasado este Tribunal, aunque no dentro del contexto de una queja específica contra uno de sus Jueces, sí ha tenido ante su consideración situaciones que podrían considerarse similares a la del caso de autos.

En 1981, el entonces ex Juez Presidente, quien durante su incumbencia estuvo muy activo como conferenciante y se expresó fuera del estrado sobre diversos asuntos, en un Mensaje a la Asociación de Miembros de la Policía, Inc., criticó públicamente la "politización de la policía". Como consecuencia de estas manifestaciones fue criticado por dos (2) miembros de este Tribunal. Uno de ellos le expresó a los medios noticiosos del país que " 'preocupado el Juez Presidente por la situación que impera en el país, en varias

cedimientos distintos a los que establece la Constitución del Estado Libre Asociado.

En Estados Unidos la posición asumida por la mayoría de los tribunales estatales es que un juez no puede ser residenciado, destituido o suspendido por violar los cánones de ética judicial per se, a menos que exista legislación específica que así lo autorice. Sin embargo, puede ser residenciado, destituido o suspendido por cometer actos que violan los cánones de ética judicial si dichos actos, por sí solos, justifican tal acción dentro del poder discrecional concedido por la disposición estatutaria. Anotación, *Power of Courts to Remove or Suspend Judge*, 53 A.L.R. 3d 882, 884 (1973). Con relación al residenciamiento de Jueces del Tribunal Supremo de Estados Unidos y cortes federales, véase Anotación, *supra*, pág. 882.

[4] En *In re Solicitud de Lugo Bougal y Arraiza*, 112 D.P.R. 134 (1982), se planteó la aplicación del Canon XX de Ética Judicial, 4 L.P.R.A. Ap. IV-A, a una queja presentada contra el ex Juez Asociado Jorge Díaz Cruz. Luego de analizar los hechos e interpretar el Canon XX de Ética Judicial, *supra*, determinamos que la conducta de la queja no violaba los cánones de ética judicial y procedimos a declarar "no ha lugar a proveer ulteriores procedimientos". *In re Solicitud de Lugo Bougal y Arraiza*, supra, pág. 140.

ocasiones ha hecho pronunciamientos formales sobre cuestiones públicas que podrían tener implicaciones políticas' ". Serrano Geyls, *op. cit.*, pág. 71. El otro Juez Asociado, en ocasión de inhibirse en el caso *Santiago v. Superintendente de la Policía*, 112 D.P.R. 205, 222 (1982), voto de inhibición del Juez Asociado Señor Negrón García, criticó el que el ex Juez Presidente hubiera "refrendado a priori, la tesis de politización en la Policía ante la Asociación de Miembros de la Policía, Inc., teoría en que se" fundó el caso objeto de la inhibición. Señaló esta actuación como un "juicio a destiempo" que definió como "la opinión, recomendación o señalamiento fuera del estrado sobre un asunto sometido o susceptible —por la naturaleza del asunto o la jerarquía jurisdiccional del magistrado— de serle en el futuro sometido". *Santiago v. Superintendente de la Policía*, supra, pág. 218. Por su parte, el entonces Gobernador Carlos Romero Barceló también se unió a las críticas afirmando públicamente que: " 'El Juez Presidente ... no debe prestarse para este tipo de actividades. Abre la posibilidad de que los jueces se vean envueltos en debates públicos en un período eleccionario y que se puedan prestar a ser interpretados como ataques de tipo político contra la Administración de Gobierno'." Serrano Geyls, *op. cit.*, pág. 71.

A pesar de las críticas vertidas por dos (2) de los Jueces Asociados con relación a las manifestaciones del entonces Juez Presidente, del cariz político que tomó el asunto y del hecho de que estábamos en año eleccionario, este Tribunal no se pronunció sobre la aplicación de los cánones de ética judicial a la conducta del ex Juez Presidente. El resultado final de toda esta polémica fue la inhibición de los dos (2) jueces participantes en la polémica.

Recientemente, en ocasión en que el Gobernador sustituyera a varios jueces, Superiores y de Distrito, cuyos términos habían vencido y estaban ocupando sus cargos bajo la cláusula de continuidad (*holding over*), surgió una situa-

ción que provocó una controversia pública entre la Rama Judicial y las otras dos (2) Ramas de gobierno. En aquella ocasión este Tribunal adoptó una resolución en la cual, entre otras cosas, criticó el sistema de nombramientos de jueces y recomendó legislación para afianzar y fortalecer la independencia judicial.

█ A pesar de que se generó una polémica que mantuvo al Tribunal en el centro de una controversia pública, el Tribunal entendió que actuaba en defensa de la separación de poderes y, consecuentemente, de la independencia judicial. Canon XIII de Ética Judicial, *supra*. Como consecuencia de dicha polémica, las tres (3) Ramas constituyeron una comisión conjunta, compuesta por el Gobernador, el Presidente del Senado, el Presidente de la Cámara y el Juez Presidente del Tribunal Supremo, cuya labor culminó en la reciente adopción y aprobación de varias leyes que propenden a fortalecer el sistema judicial.[5]

█ Al cumplir con el deber de fortalecer la Rama Judicial, los jueces debemos prudencialmente evitar pronunciamientos y juicios a destiempo sobre asuntos sometidos a su consideración o que podrían ser susceptibles a serles sometidos. Ahora bien, el hecho de que alguna manifestación de un juez de este Tribunal adquiera matices políticos y lo involucre en una controversia pública no necesariamente convierte dicha conducta en una contraria a los cánones de ética judicial. A lo sumo, podría resultar, como ocurrió en el caso de *Santiago v. Superintendente de la Policía*, supra, que los jueces involucrados en el debate público se tengan que inhibir en cualquier caso que surja relacionado con la polémica. Véase *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267 (1988).

A tenor con lo antes expresado, *se dictará sentencia or-*

---

[5] Leyes Núms. 91 y 92 de 5 de diciembre de 1991.

*denando el archivo de la solicitud presentada por los seño-
res Representantes Samuel Cepeda García, Fernando To-
nos Florenzán, Héctor Castro Marchán y José Guillermo
Rodríguez, por falta de jurisdicción.*

El Juez Asociado Señor Negrón García emitió voto de
inhibición. El Juez Asociado Señor Rebollo López emitió
voto particular de inhibición.

— O —

Voto de inhibición del Juez Asociado Señor Negrón García.

I

Por su contenido y trámite, es obvio que se ha querido
dar a la solicitud de los Hons. Samuel Cepeda García, Fer-
nando Tonos Florenzán, Héctor Castro Marcial y José Gui-
llermo Rodríguez —miembros de la Cámara de Represen-
tantes por la mayoría del Partido Popular Democrático
(P.P.D.)— la apariencia de que nuestras recientes palabras
de 10 de enero de 1992 constituyeron un quebrantamiento
ético-judicial. Las mismas fueron vertidas en ocasión de la
juramentación de los Jueces Superiores, Hons. Bruno Cor-
tés Trigo y Wilfredo Santos López.

Igual tesis adelantó el Secretario de Justicia, Hon.
Jorge E. Pérez Díaz, y el Gobernador, Hon. Rafael Hernán-
dez Colón, quien incluso nos pidió públicamente la renun-
cia y un desagravio. En síntesis, se sostiene que nuestras
palabras versaron sobre un asunto político encaminado a
ser objeto de campaña electoral, vedado a los jueces. La
base central del planteamiento es por asociación o coinci-
dencia, esto es, la prohibición surge porque algunos políti-
cos han hecho algunos señalamientos al respecto. A tales
efectos, en su solicitud, el Honorable Cepeda García *et al.*

unieron como anejos nuestras expresiones y varios artículos de la prensa que cubría la cuestión.

## II

Siempre hemos partido de la premisa de que los cánones de ética judicial aplican a todo miembro de la Judicatura, incluso a nosotros, en todo aquello que no sea incompatible con la naturaleza constitucional de este Tribunal y su carácter colegiado. *In re Solicitud de Lugo Bougal y Arraiza*, 112 D.P.R. 134 (1982); *Interpretación Cánones de Ética*, 102 D.P.R. 1031, 1032 (1974); *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 94 (1980), opinión concurrente. "No se puede desdeñar o negar seriamente la existencia de la ética y la moral, cuyas génesis e influencias trascienden la simple lectura de textos y aquel estado ideal metafísico de puro valor inmutable. Aunque intangible, la ética es fuerza que se percibe, detecta e intuye." *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 308 (1980), opinión concurrente y disidente; *Santiago v. Superintendente de la Policía*, 112 D.P.R. 205, 212 (1982), voto de inhibición.

## III

Nuestras expresiones están enraizadas en la concepción de que el principio constitucional de independencia judicial, por su estima valorativa intrínseca, no es un asunto vedado de naturaleza político-partidista, sino uno "inmanente a la función de administrar la justicia, que es exigencia y al mismo tiempo ideal de la vida jurídica". *Retiro del Hon. Víctor M. Pons Núñez*, 129 D.P.R. 931, 932 (1992). El Poder Judicial posee la facultad inherente —y el deber— de protegerlo y promoverlo. Canon XIII del Código de Ética Judicial, 4 L.P.R.A. Ap. IV-A; *Ortiz Angleró v. Barreto Pérez*, supra.

*Puede honestamente discreparse de esta concepción. Ciertamente no es nueva ni privativa.* Aunque con lenguaje distinto y frente a hechos algo diferentes, está en consonancia con la premisa subyacente y el espíritu de la Resolución del Tribunal de 14 de abril de 1988, mediante la cual se convocó a una Sesión Especial de la Conferencia Judicial para el 2 de octubre de 1988. *Convoc. Sesión Especial Conf. Judicial*, 120 D.P.R. 838 (1988).

El ingrediente catalítico de esa convocatoria fue el comunicado de prensa del entonces Juez Presidente Señor Pons Núñez de 12 de abril de 1988, en el cual expuso su posición crítica sobre la negativa del Gobernador, Hon. Rafael Hernández Colón, a renominar para el cargo de Juez Superior al Hon. Guillermo Arbona Lago. Esa postura fue endosada por todos los Jueces Asociados que integraban el Tribunal. El aludido comunicado de prensa se incorporó como anejo a la antedicha resolución por coincidir el Tribunal unánimemente con la honda preocupación del Juez Presidente Señor Pons Núñez. Resolución de 14 de abril de 1988, *Convoc. Sesión Especial Conf. Judicial*, supra, págs. 840–841. Según sus términos, a juicio del Tribunal, la cuestión iba a la "médula" del "contenido *real* del concepto de independencia judicial dentro de nuestro esquema constitucional de separación de poderes". (Énfasis suplido.) Íd., pág. 839.

Naturalmente, al igual que en el presente, en aquel momento —en año de campaña eleccionaria— la postura del Juez Presidente Señor Pons Núñez, del Tribunal y de los Jueces individuales, generó por algún tiempo distintas noticias y editoriales del debate público —desde endosos hasta ataques y señalamientos de infracciones a la separación de poderes, implícitamente éticas— estos últimos bajo el supuesto de que se trataba de un asunto exclusivamente político-partidista. Este señalamiento, fue rechazado unánimemente por el Tribunal y, salvo pocas excepciones, a coro por la comunidad jurídica y la ciudadanía en general.

A fin de cuentas, quienes pueden "politizar" el principio de independencia judicial, ínsito en la separación de poderes, son los políticos, no los jueces. Abandonar su defensa, por esa razón, es inconcebible.

Si penetramos tras bastidores vemos que se trata del mismo viejo guión.

### IV

Suscribimos este voto sin haber participado en el proceso de deliberación y redacción del *Per Curiam*. Independientemente de su resultado, no sabemos bajo qué facultad constitucional han actuado cuatro (4) miembros individuales de este Foro para configurarla con carácter institucional. La premisa implícita, ¿ha sido considerarnos *partes*, sus *pares* o ambas cosas? ¿Quién custodia a los custodios? (*quis custodiet custodiem*). Nos abstenemos de analizar esas y otras interrogantes.

Sí sabemos que son fundamentales, pues "[l]a decisión sobre la recusación de un Juez de este Tribunal es individual y no plenaria. Corresponde a él y su conciencia resolver cualquier planteamiento de esta índole". *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267, 277 (1988). Y como dijo hace dos (2) milenios el eterno Maestro del Gólgota, "con la medida que ustedes juzguen, serán juzgados". *San Lucas* 6:27–34. Bajo cualesquiera tesis, más que al juicio pasajero contemporáneo, nos sometemos a la sentencia inapelable que dictará la Historia.

**— O —**

Voto particular de inhibición emitido por el Juez Asociado Señor Rebollo López.

A pesar de que, por los fundamentos que expondremos en la Parte II, *no* hemos participado en forma alguna en la

consideración, y solución, de la "queja" radicada en contra nuestra por cuatro miembros de la Asamblea Legislativa de Puerto Rico, *consideramos procedente hacer unos pronunciamientos en relación con la misma y la acción hoy tomada por el Tribunal.*

## I

Realmente resulta difícil entender la actuación de estos cuatro miembros de la Cámara de Representantes de Puerto Rico. La misma es tan inaudita e improcedente que, a nuestro juicio, únicamente se puede deber a una de tres situaciones: (1) un *craso desconocimiento* no sólo de nuestro *ordenamiento jurídico* sino que de *la función de la Judicatura en una democracia* como la nuestra, en especial de la *independencia judicial* que debe imperar en tal sistema de gobierno y de lo que *dicha independencia significa e implica*; (2) que estos señores representantes están *actuando como testaferros de otros*, o (3) la existencia de un *propósito ulterior avieso* de parte de estos cuatro señores legisladores. Ello así por varias razones.

*En primer lugar*, los pronunciamientos que este Juez hiciera el viernes 10 de enero de 1992 fueron hechos, *en defensa de la independencia judicial, sobre un asunto que precisamente afecta, de manera extraordinaria, esa independencia judicial* —esto es, la designación, y juramentación, de políticos activos como jueces sin que exista un período razonable de tiempo entre el ejercicio de ambas funciones— en un *acto de juramentación de jueces* en la sede de este Tribunal, ocasión *en que precisamente juramentaba como juez un político que hasta ese momento ocupaba un cargo electivo como tal.* Si esa ocasión no era la indicada, y propia, para hacer esos pronunciamientos, realmente no existe ninguna otra.

*En segundo término*, la posición que sostuvimos entonces, y que ratificamos en el día de hoy, *está basada en una*

*interpretación razonable de unas disposiciones específicas de la Constitución del Estado Libre Asociado de Puerto Rico*. El hecho de que dichos pronunciamientos incidan, de alguna manera, en la esfera política o de que, desafortunadamente, coincidieran con el comentario de un político a esos mismos efectos, *no afecta en forma alguna la propiedad y validez de los mismos.*

En tercer lugar, esa acción nuestra *no es nueva ni única.* Procede *señalar y enfatizar* el hecho de que, cuando menos, en *dos ocasiones* anteriores, los Jueces de este Tribunal han hecho *manifestaciones similares en defensa de la independencia judicial,* a saber: el 12 de abril de 1988, cuando el Juez Presidente Señor Pons Núñez, *en un comunicado de prensa,* comentó el fallido intento del Gobernador de Puerto Rico de sustituir al Hon. Guillermo Arbona Lago, como Juez del Tribunal Superior. Como es sabido, *dichas manifestaciones fueron endosadas, y adoptadas, por los restantes miembros del Tribunal en Resolución que se emitiera con fecha de 14 de abril de 1988*; resolución mediante la cual se convocó por este Foro para una Sesión Especial de la Conferencia Judicial para, precisamente, tratar del tema de la independencia judicial.

*Por otro lado,* el 25 de enero de 1990, en un acto de juramentación de jueces en el Salón de Sesiones de este Tribunal, tres de sus integrantes —a saber, el Juez Presidente Señor Pons Núñez, el Juez Asociado Señor Negrón García y el Juez suscribiente— hicieron *manifestaciones similares* en defensa de la independencia judicial. *Procede que uno se cuestione: ¿Por qué estos cuatro señores legisladores no se "querellaron" en dichas ocasiones anteriores? En relación con ello, ¿hará alguna diferencia el hecho de que en esta ocasión únicamente estamos envueltos el compañero Juez Asociado Señor Negrón García y el Juez suscribiente?*

*Por último,* este Tribunal es el *organismo rector* de la Rama Judicial. Sus integrantes no sólo tienen *la responsa-*

*bilidad de resolver* los casos que son traídos ante su consideración, sino que tienen *la obligación y el deber de defender dicha Rama del Gobierno*, sobre todo contra acciones que ponen en peligro *la preciada independencia judicial*; la cual, dicho sea de paso, *es la razón de ser de la existencia de la Rama Judicial y el baluarte en que descansa la confianza que pueda tener la ciudadanía en la misma.*(¹)

La *mejor evidencia* del *grave peligro* que en estos momentos corre la independencia judicial lo constituye precisamente la *acción tomada* por estos cuatro señores legisladores. Su *acción concertada* —en la supuesta defensa de un compañero legislador convertido, como por arte de magia, en juez— tiene el *obvio propósito* de intentar *amedrentar y amordazar* a los miembros de la Rama Judicial puertorriqueña.

*Debe quedar meridianamente claro que para el Juez suscribiente la dignidad judicial y la independencia judicial no son negociables. En consecuencia, nada ni nadie podrá nunca amedrentarnos ni evitar que continuemos, con ahínco y sin temor de clase alguna, defendiendo esa dignidad e independencia judicial.*

Como expresáramos el pasado 10 de enero, lo fácil hubiera sido permanecer callados. El *desempeño responsable* de la función judicial, sin embargo, nunca resulta fácil. La acción de señalar y denunciar la existencia de una situación intolerable y perjudicial al bienestar general y judicial de nuestro Puerto Rico nunca puede ser considerada como impropia e improcedente.

*Desafortunadamente, en un mundo donde existen perso-*

---

(¹) El dictamen mayoritario *erróneamente* intenta equiparar las expresiones a las que hemos hecho referencia, *las cuales fueron hechas en defensa de la independencia judicial*, con manifestaciones que en dos ocasiones distintas hiciera el ex Juez Presidente de este Tribunal, Lcdo. José Trías Monge, en discursos que pronunciara éste el 25 de abril de 1980 y el 26 de diciembre de 1981.

*Dada la naturaleza de las manifestaciones del licenciado Trías Monge* —las cuales, por delicadeza, nos abstenemos de calificar— *resulta obvio que la semejanza no cabe.*

*nas de criterios vacilantes, cautivos y serviles, las posicio-
nes firmes resultan difíciles de entender para éstos y, en
ocasiones, son calificadas por ellos como impropias y
atrevidas.* Las "armas" con que cuenta el Juez, cuales son
*la palabra y su pluma,* deben y pueden ser utilizadas en
forma *franca y vigorosa* ya que esas "armas" son las únicas
que tenemos los jueces a nuestro alcance para defender las
causas justas y para denunciar situaciones, como la pre-
sente, que afectan el bienestar y la independencia de la
Judicatura puertorriqueña.

*El que piense que la Rama Judicial es una colonia, o
finca privada, de las Ramas Ejecutiva y Legislativa de
nuestro Gobierno está profundamente equivocado.* Conside-
ramos pertinentes, y aplicables, a la situación ante nuestra
consideración unas expresiones hechas hace algunos años
por una conocida figura pública puertorriqueña *sobre la
importancia del proceso de selección de jueces:*

> Ante la creciente intervención del estado moderno en todos
> los órdenes de la vida, es el Juez *baluarte de la libertad in-
> dividual,* poder institucional para contener dentro de límites
> constitucionales las invasiones al derecho de la libertad *que
> ciegamente sancionan las masas aletargadas por la demago-
> gia de los políticos.* (Énfasis suplido.)[2]

## II

Mediante Opinión *Per Curiam,* de fecha 12 de enero de
1988, emitida en *Noriega v. Hernández Colón,* 120 D.P.R.
267 (1988) —recurso en que el demandante apelado David
Noriega presentó una moción de recusación en la cual so-
licitó se decretara la inhibición del Juez Presidente Señor
Pons Núñez— este Tribunal resolvió, en lo pertinente, que
en vista de que la función colegiada garantiza "que la de-

---

[2] R. Hernández Colón, *Sobre la selección de la Judicatura,* Año III (Núm. 8)
Rev. Der. Pur. 91 (1963).

cisión final certificada responda al legítimo criterio mayoritario informado, nunca a la situación individual o preferencias privadas de los componentes del Tribunal", la "decisión sobre la recusación de un Juez de este Tribunal *es individual y no plenaria. Corresponde a él y su conciencia resolver cualquier planteamiento de esta índole*". (Énfasis suplido.) *Noriega v. Hernández Colón*, supra, págs. 276 y 277.

Como expresáramos anteriormente, la "queja" presentada contra el compañero Juez Asociado Señor Negrón García y el Juez suscribiente por estos cuatro señores legisladores es una, a todas luces, infundada *que debió haber sido perentoriamente desestimada por la mayoría de los integrantes del Tribunal con un cortante "nada que proveer"*. Aparte del hecho incuestionable que este Tribunal no tiene jurisdicción, ni autoridad en ley de clase alguna, para "enjuiciar, amonestar o exonerar" a uno de sus miembros, la acción mayoritaria, "de atender y darle foro" a esta queja absurda, no le hace ningún bien a nuestro sistema de justicia en general por cuanto la misma tiene la nociva e indeseable consecuencia de promover y fomentar la radicación de quejas viciosas y mal intencionadas contra los miembros de la Judicatura puertorriqueña.

La errónea acción mayoritaria a esos efectos con toda probabilidad expondrá a este Foro, y a cada uno de sus integrantes, a ser blanco en el futuro de continuas imputaciones inmeritorias y maliciosas que tendrán que ser igualmente "atendidas y consideradas" por el Tribunal con ningún fin práctico. Ello, naturalmente, causará que el Tribunal no pueda dedicarle ese tiempo precioso y necesario a otros asuntos que tienen gran importancia para nuestra ciudadanía, los cuales actualmente languidecen, y duermen "el sueño de los justos", en las distintas oficinas de los Jueces de este Tribunal en espera de acción judicial.

Acorde con lo resuelto en *Noriega v. Hernández Colón*, supra, ante una queja tan absurda y totalmente carente de

méritos, realmente resulta irrelevante, y poco determinante en la *decisión final colegiada* que tome este Tribunal sobre el asunto, que el Juez contra quien se dirige dicha queja participe o no en la consideración y disposición de la misma. Dicha situación, por sí sola, sería razón suficiente para negar toda posibilidad de no participación.

*Ello no obstante, por razones de escrúpulo personal y de prudencia institucional, hemos considerado aconsejable abstenernos de participar, en esta etapa de los procedimientos, en la consideración de la mal llamada "queja" radicada por los mencionados legisladores.*

### III

*Unos pensamientos finales.* Hace cerca de diez años, al tomar posesión del cargo que hoy ocupamos, juramos defender la Constitución de los Estados Unidos de América y la Constitución, y las leyes, del Estado Libre Asociado de Puerto Rico contra todo enemigo interno o externo de éstas. *Al así hacerlo, escogimos nuestro camino; no pensamos detenernos a mitad del mismo. Seguiremos en el camino escogido, siempre en línea recta.*

El juez no sólo será juzgado por la historia a base de la justicia que ha dispensado, sino por la injusticia que ha evitado que ocurra. Su labor es una incesante que nunca termina. Es por ello que no debemos perder mucho tiempo con las personas mal intencionadas que nos gritan en nuestro camino —*algunas, en servil obediencia de sus superiores*— las cuales pretenden interrumpir el desempeño responsable de nuestro cargo.

No hay nada pequeño e insignificante en el quehacer diario de hacer justicia. La Judicatura es un inmenso taller donde la más pequeña labor que se realiza, en forma honesta y responsable, determina si la justicia que se dispensa en la jurisdicción en que laboramos es una brillante u opaca.

No escogemos los asuntos que van a ser objeto de nues-

tra consideración. Es en el momento que éstos surgen que decidimos cuál será el contenido de nuestras expresiones y la ocasión apropiada, dentro del desempeño de las funciones de nuestro cargo, para efectuar las mismas. Al hacerlo, sin embargo, únicamente debemos responder a los dictados de nuestra conciencia.

Los jueces no deben permanecer callados por razón de temor, indiferencia o falta de laboriosidad. No tenemos ese derecho. *La dignidad del cargo que ocupamos y la independencia de criterio que el desempeño responsable del mismo requiere, repetimos, nunca pueden ser objeto de negociación, compromiso, presiones o influencias de clase alguna.*